## ELLIOTT CO. v. H. S. B. W.–COCHRANE CORPORATION.

District Court, E. D. Pennsylvania. June 1, 1928.

No. 3163.

1. Patents 8, 231, 241—Mere results derived from method or apparatus are not patentable, and one who obtains same result through other method or apparatus is not infringer.

Mere results derived from method or apparatus are not patentable, and a defendant who has obtained same results through other method or apparatus is not, because of similarity in results, an infringer.

2. Patents 138(1)—Where invention described in reissue differed from that of original patent reissue should not have been granted after lapse of time showing unreasonable delay.

Where invention described in reissue was not same invention as that of original patent, reissue should not have been granted after lapse of time showing an unreasonable delay.

3. Patents 328—Reissue patent 15,866, relating to removing oxygen from water, held invalid because claims on question were not within same invention as set out in original patent No. 1,321,999.

Reissue patent No. 15,866, granted June 24, 1924, to W. S. Elliott, as reissue of original patent No. 1,321,999, granted November 18, 1919, relating to removal of oxygen from hot water by physical or mechanical means, held invalid as against defendant, because claims on which plaintiff relied were not within same invention as set out in original patent, and patentee unduly delayed application for reissue after alleged necessity became known to him.

4. Patents 328—1,497,491, for removal of oxygen from hot water, held not infringed.

Defendant held free to use whatever relations of elements are necessary in deaeration. without infringement of patent No. 1,497,491, granted to W. S. Elliott, June 10, 1924, relating to removal of oxygen from hot water by mechanical or physical means, as distinguished from removal by chemicals.

5. Patents 241—That patentee obtained patent on apparatus producing result which was advance in art did not give monopoly in every apparatus or means for producing same result.

That patentee had obtained patent on an apparatus which produced result which was an advance in the art did not give him a monopoly in every apparatus or means for producing same result.

6. Patents 328—1,457,153, relating to removing oxygen from water, claims 4–9 and 11–13, inclusive, held not infringed.

Patent No. 1,457,153, granted May 29, 1923, to W. S. Elliott, relating to removal of oxygen from hot water by mechanical or physical means, as distinguished from removal by chemicals, claims 4–9 and 11–13, inclusive, held not infringed.

In Equity. Patent infringement suit by the Elliott Company against the H. S. B. W.–Cochrane Corporation. Decree in accordance with opinion, dismissing bill.

Cyrus N. Anderson, of Philadelphia, Pa., and Byrnes, Stebbins & Parmelee, of Pittsburgh, Pa., for plaintiff.

Michael A. Foley, of Philadelphia, Pa., and John E. Hubbell and W. Brown Morton, both of New York City, for defendant.

THOMPSON, District Judge. This suit is based upon the alleged infringement of three patents owned by the plaintiff, namely, No. 1,457,153, granted May 29, 1923, to W. S. Elliott; reissue patent No. 15,866, granted June 24, 1924, to W. S. Elliott, as a reissue of original patent No. 1,321,999, granted November 18, 1919; and No. 1,497,491, granted to W. S. Elliott on June 10, 1924. The patents in suit relate to the removal of oxygen from hot water by mechanical or physical means, as distinguished from removal by chemicals. The art of deaeration of feed water for steam boilers and other industrial purposes has made rapid advances in recent years, due to the fact that the high degree of steam pressure in industrial plants has necessitated the adoption of steel tubing for economizers in steam boiler plants, in place of the cast iron economizers formerly in general use in low-pressure plants. The steel tubing is quite susceptible to corrosion through the presence of oxygen in the feed water used in feed water heaters, in reboilers, and in condensers.

The plaintiff claims that, under the Elliott patents, a substantial advance has been made in the deaeration art, and that the basis of the results obtained is the application of the physical laws of Henry and Dalton relating to partial pressure and solubility of gases and liquids. The statement of Dalton's law by Mr. McDermet, a witness for the plaintiff, is as follows:

"Dalton's law indicated particularly the method. It states that the pressure of gases and of vapors approximately exists independently in a mixture; that is, each gas in a mixture exerts its own partial pressure. When I say partial pressure, I mean a part of the total pressure."

The same witness stated Henry's law as follows:

"Gases, including the air or the constituents of air, dissolve in water in proportion to their partial pressure at the surface of the water or in contact with the water."

The application of these laws is stated in the plaintiff's brief as follows:

"In other words, the quantity of gas absorbed by water is proportional to the partial pressure of that gas in the atmosphere above the water. Hence under any given total pressure, if the partial pressure of one gaseous component of the atmosphere above a body of water is increased, the partial pressure of another component is correspondingly reduced, and consequently the solubility of the latter gas in that water is decreased, so that no gas will leave the water until the lowered partial pressure of this gas in the atmosphere is satisfied. As the specific principle to employ, Elliott conceived the idea of increasing the partial pressure of water vapor or steam above the hot water, to thereby reduce the partial pressure of the air or oxygen in the atmosphere above the water, and of continuing this increase in the partial pressure of the steam until its partial pressure should substantially equal the total pressure of this atmosphere."

The plaintiff claims that Elliott conceived the idea that it was essential to create and continuously maintain a deaerating atmosphere having a low partial air pressure; that such a deaerating atmosphere could be produced, either by feeding steam into such atmosphere or by heating the water to cause a change of phase, or the evaporation thereof sufficient to obtain a total pressure exerted almost entirely by the steam alone, at the same time providing sufficient space to permit the air to pass from the water into such space. By increasing the partial pressure of the steam, the excess of air in the solution would be caused to leave the water, thus causing a mixture of the steam and air, and causing the dissolved air to be carried off with the steam atmosphere above the water.

According to the testimony produced by the plaintiff, the result of Elliott's invention was a method and apparatus which attained the nearest approximation to air-free water which had ever up to that time been produced in commercial apparatus. The Elliott patents cover treatment of the water in two stages: The first or temperature stage, wherein the water is introduced into a chamber forming an induction heater through the operation of which steam is drawn from the waste steam supply of the power plant and brought into contact with the water while flowing over trays, which is thereby brought to the desired temperature, and is then introduced into the second or pressure stage of lower pressure. The water supply is regulated by the ordinary form of float valve, and the steam is drawn off by means of a vent condenser, through pipes surrounded by the incoming water for supplying the temperature stage chamber, whereby the steam containing the contaminating air which has been caused to leave the feed water is condensed and carried off; the raw water supply being preheated by contact with the pipes carrying off the steam and air for condensation.

As stated by the plaintiff's counsel, the apparatus built and employed under the Elliott patents may be divided into two general classes:

(1) The class wherein water is superheated in the first or temperature stage, and is then fed into the second or pressure stage of lower pressure. Here there is a sudden ebullition of steam, or change of phase of a portion of the water, due to its entry into this region of lower pressure. This is the so-called flash type.

(2) The class wherein the water is raised as nearly to the desired temperature as the presence of air in its atmosphere will permit in the first or temperature stage, and is then fed into a second or pressure stage, where it is supplied with external heat, usually in the form of steam. This steam may be either brought into direct contact with the water in the second stage, as in the two-stage tray form, or the two-stage combined tray and reboiler form, or the steam may be supplied to a closed heater in the second stage, and kept out of direct contact with the water. In the latter case it supplies sufficient external heat to the water to evaporate or cause a change of phase of a sufficient amount of the water to give the necessary steam atmosphere in contact with the water.

It is claimed that there are, therefore, two subclasses in accordance with the plaintiff's patents under this second general class. In the first species of the second class, the supply steam forms the deaerating atmosphere in direct contact with the water; while, in the second species of the second class, there is always evaporation of a sufficient amount of the water being deaerated to supply the necessary steam atmosphere.

Having thus stated in general terms what the plaintiff claims as the basic features of Elliott's invention, we will proceed to con-

sider the history of the patents in suit, in order to determine the validity of the patents, as read upon the defendant's several constructions of deaerating apparatus, and also to determine whether, if construed in the light of the prior art, the defendant has infringed any or all of the plaintiff's patents.

[1] In view of the emphasis laid by the plaintiff upon the novelty of the result obtained by Elliott's inventions, a large part of the testimony and the argument on behalf of the plaintiff being devoted to similarity in results, it must be borne in mind that mere results derived from a method or apparatus are not patentable, and a defendant who has obtained the same results through other methods and other apparatus is not, because of the similarity in results, an infringer, and a defendant cannot be convicted of infringement unless his method or apparatus can be read upon the claims of the plaintiff's patents, as construed in connection with the specifications of the patents in suit.

Elliott's first patent application (serial No. 18,268) was filed on March 31, 1915. It contained both process or method claims and apparatus claims. The Patent Office required division between the method claims and the apparatus claims, and accordingly the application was divided and the method claims retained therein. The original application matured into patent No. 1,321,999, granted on November 18, 1919, and contained the method claims; while the divisional application (serial No. 158,238) matured into patent No. 1,457,153, granted on May 29, 1923, and contained the apparatus claims. On April 22, 1924, a reissue application of the original method patent, No. 1,321,999, was filed, the original patent being surrendered; and on June 24, 1924, the reissue patent No. 15,866 was granted, containing amended claims of method.

Patent No. 1,497,491 claims specific improvements upon the inventions of the other two patents, and is claimed to differ from those two patents, in that it is strictly limited to evaporation by external heat of a definite percentage of the liquid being treated, sufficient to release all of the contained air. The plaintiff has maintained throughout the trial and argument of the case the grant to Elliott through these several patents of a monopoly in the results of what is considered complete commercial deaeration in its methods and apparatus, and, by reason of these broad claims and the scope of its attack upon the defendant's construction, has thrown its several patents in suit open to

26 F.(2d)—52

whatever grounds of attack may be raised under the patent laws against them.

In order to understand the status of plaintiff's reissue patent No. 15,866, an examination of the original patent No. 1,321,999, upon which the reissue patent was based, shows that the specification describes only the flash method of deaeration. The operation by which the water is brought to the desired temperature in the heater is described, and the water "is then discharged into the receiver, in which a partial vacuum is maintained by the action of the pump 25. The effect of this vacuum upon the water entering the receiver is to cause it to boil at a temperature which is lower than the temperature of the liquid immediately before it enters the receiver. By maintaining a sufficient degree of vacuum in this receiver, the water entering it is immediately subjected to a violent boiling action, and is in part rapidly converted into vapor. In fact, the boiling action which occurs is of such a violent character that it is in the nature of an explosion or flashing. The water then flows down over the series of distributers in a distributed or filmlike condition, so that all portions thereof are subjected to the vacuum action. The combined effect of the flashing or explosion, and of the vacuum acting upon the water in moving over the distributers, results in the air and other dissolved gases contained in the water being extracted to a maximum extent."

The claims in that patent are all flash claims, in accordance with the specification. The original patent was applied for March 31, 1915, and granted November 18, 1919. The reissue was applied for April 22, 1924, and granted June 24, 1924. Elliott's ground for application for the reissue was that the original patent was invalid because of a defective specification, and that the defect consisted in the patentee having claimed in his invention more than he had a right to claim as new.

The defendant attacks the validity of the reissue upon the ground, established by the evidence, that the defendant had acquired intervening rights, and upon the ground of laches in failing to apply for the reissue within two years; the application for reissue being approximately four years and five months after the granting of the original patent. While the plaintiff contends that the claims and specification were narrowed by the reissue, the contents of the reissue patent in my opinion conclusively show the contrary. Moreover, the plaintiff's contention is at variance with the proposition, set out in

the brief and at the argument, that its claim of infringement is not based upon the preferred flash form of apparatus shown in the patent, but that only the broader claims are in issue.

In the specification of the original patent, the flash method was set out after the comprehensive phrase "in carrying out my invention," clearly indicating that the invention was confined to the flash method. In enlarging the specification, the words *"in carrying out my invention"* were stricken out and the following language substituted:

*"The object of the present invention is to provide a simple method and means for the treatment of water or other liquids by which a maximum percentage of the air and other gases contained therein may be removed from the liquid before the latter is used.*

*"The present invention involves broadly the treatment of liquid to effect the release therefrom of its contained air and other gases and by subjecting the same to such conditions that there is produced a change of phase of such a percentage of all the liquid being treated as to insure the removal of substantially all of the air.*

*"In the illustrated method of producing this change of phase or evaporization of a definite percentage of the liquid."* Then follows the description of the flash action.

It will thus be seen that the flash method, set out in the original patent as that to be followed in carrying out the invention, was abandoned as such, and the method merely applied as the illustrated method of producing the change of phase or evaporation of a definite percentage of the liquid, as set out in the amendment to the specification. This new matter is on its face foreign to the original specification, and it is under this new matter that the broader claims of the reissue are set out. This conclusion is reinforced by the affidavit of Mr. McDermet of March 29, 1919, filed in the Patent Office to secure the allowance of the claims of patent No. 1,321,999, which clearly set out that the essential feature of the patent is the flashing action.

[2] Before the reissue was applied for, the defendant had acquired rights in the development of its deaeration which are attacked in this suit. As it is apparent that the invention described in the reissue is not the "same invention" as that of the original patent, the reissue should not have been granted after the lapse of time which shows an unreasonable delay. Parker & Whipple Co. v. Yale Clock Co., 123 U. S. 87, 8 S. Ct. 38, 31 L. Ed. 100; Carpenter Straw-Sewing Machine Co. v. Searle (C. C. A.) 60 F. 82; Mahn v. Harwood, 112 U. S. 354, 5 S. Ct. 174, 6 S. Ct. 451, 28 L. Ed. 665; Wollensak v. Reiher, 115 U. S. 96, 5 S. Ct. 1137, 29 L. Ed. 350; Topliff v. Topliff, 145 U. S. 156, 12 S. Ct. 825, 36 L. Ed. 658; Supreme Manufacturing Corporation v. Security Manufacturing Co. (C. C. A.) 299 F. 65.

[3] My conclusion is that reissue patent No. 15,866 is invalid, as against this defendant, for the reason that the claims on which the plaintiff relies are not within the same invention as set out in the original patent No. 1,321,999, and Elliott, without any reason therefor, unduly delayed the application for the reissue after its alleged necessity had become known to him.

Elliott patent No. 1,497,491 was granted June 10, 1924, upon an application filed February 24, 1922. The application for Elliott's original patent No. 1,321,999 was based upon the ground that Elliott was the first and original discoverer of the flash method of deaeration. In applying for reissue No. 15,866, Elliott expressly abandoned his claim in the original patent of having originated the flash method of deaeration. Patent No. 1,497,491 is for improvements in methods of treating liquids and apparatus therefor of the prior patents. The specification states:

"In separating gases from liquids there are several important variables which must be taken into consideration. These variables include the amount of dissolved gases contained in the liquid before treatment, the degree of separation required, and the temperature employed for the amount of separation required. * * * I have found from investigation and experimentation that a definite amount of heat must be dissipated at a definite temperature to separate definite quantities of gases originally contained in the liquid, and in order to eliminate the time element and purify a constant liquid supply as it flows through the apparatus, I have found it necessary to not only maintain the boiling point of the liquid, but in addition to supply thereto a sufficient quantity of heat to evaporate a definite percentage of the liquid as it flows from the supply through the apparatus to the point of use."

[4] In the above excerpts from the specification, and elsewhere throughout the specification, there is constant repetition of the plaintiff's discovery that, in his invention for the treatment of liquids, there must be a definite amount of heat, dissipated at definite temperature, to separate definite quantities of gases, and to supply thereto a sufficient quantity

of heat to evaporate a definite percentage of the liquid. The claims of this patent in suit are all based upon definite pressure, sufficient amounts of heat, and change of phase of the liquid in definite percentages. Nowhere in the specification nor in the claims of the patent are those definite relations disclosed.

It was admitted by the plaintiff's expert, although it does not require expert testimony to discover the fact, that the patentee gives no numerical values for the definite relations and no instructions from which they can be computed. The process of deaeration, notwithstanding the results which have been obtained under Elliott's patents, was clearly not originated by him. It is found in the French Roncin patent, in the British Abel patent, also in United States patents, Holden 838,409, Hodges 1,860,901, and Schrempp 1,-139,378, in Shipley 681,348, and in other prior patents cited by the defendant and set out in its answer. As against this patent therefore, the definite relations not being set up, and Elliott not being the original inventor of the use of the flash method, the defendant is free to use whatever relations of elements are necessary in deaeration without infringement of this patent. Wright v. Yuengling, 155 U. S. 47, 15 S. Ct. 1, 39 L. Ed. 64; Westinghouse v. Power-Brake Co., 170 U. S. 537, 562, 18 S. Ct. 707, 42 L. Ed. 1136; De Lamar v. De Lamar Mining Co. (C. C. A.) 117 F. 240.

The remaining patent in issue is No. 1,-457,153, of which the plaintiff contends that claims 4, 5, 6, 7, 8, 9, 11, 12, and 13 are infringed by the defendant's several constructions. In the specification of this patent, Elliott states:

"In carrying out my invention, the feed water or other liquid to be treated is admitted into the receiver preferably at a relatively high temperature. A sufficient degree of vacuum is maintained in the receiver so that the liquid on entering the receiver is caused to have a violent ebullition of flashing action. This causes the liquid to be thoroughly broken up, whereby the contained air and other gases can be very effectively extracted by the vacuum action."

This is a description of the action of the flash form of apparatus, and, although Elliott describes this as the operation in which his invention is to be made effective, it is conceded throughout the testimony and the arguments of counsel that that form of flashing is not followed in any of the defendant's apparatus; but it is contended that the claims in suit, which are designated as the broader claims, should be construed as covering any apparatus in which the water to be deaerated is first subjected to a temperature stage and brought nearly to the temperature of the heating medium and from the temperature stage passes to a second or pressure stage, where the steam has substantially no heating duty, but where the air is released from the water, whether by the flashing action or otherwise, if the action of a third feature of the Elliott combination, namely, the vent condenser, regulates the amount of incoming steam into the temperature stage, and relieves the pressure of the pressure stage by withdrawal of the steam, with its accompanying air, through condensation by contact with the cooling effect of the water.

[5] Throughout the introductory statement of counsel, and throughout the trial and in the brief submitted on behalf of the plaintiff, emphasis is laid upon the results obtained by the Elliott method. It is even assumed, although deaeration was practiced in various types of apparatus and by various methods in the prior art for years before Elliott's invention, that Elliott was the first to apply in his methods and apparatus the old laws of Dalton and Henry, which have been known in science and engineering for a century. The fact that Elliott has obtained a patent on an apparatus which produces a result which is an advance in the art does not give him a monopoly in every apparatus or means for producing the same result. Therefore, if the defendant's apparatus does not operate in the same manner as the plaintiff's apparatus, and is constructed in accordance with the prior art, it cannot be held to infringe, because it accomplishes the same result as the plaintiff's apparatus, notwithstanding the acknowledged merit of the plaintiff's result. The defendant must have reached the result by substantially the same or similar means, or the rule that the function of a machine cannot be patented is of no practical value. Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 562, 18 S. Ct. 707, 42 L. Ed. 1136.

The defendant is charged with infringing plaintiff's patent because of its manufacture and sale of three different types of apparatus, namely, the open reboiler, the tray, and the surface heater types.

In defendant's open reboiler type of apparatus, the steam for heating and deaerating the water is injected into the pool of water collected in the bottom of the heating and deaerating chamber through a submerged steam spray pipe. This is a pipe

having perforations in its upper surface, and is the same form of pipe as shown in the defendant's prior Gamble patent No. 1,-050,209, and, as in the Gamble patent, the steam passes upward through the pool of water into the space above, where it comes into contact with the water supplied at the top of the chamber, and passing down through the upper portion of the chamber over trays, whereby the water, in its downward passage over the trays, is separated into spray form and heated practically to its final temperature. The heating of the water and its contact with the steam releases the air, which is thus mixed with the uncondensed portion of the steam and passes from the chamber to a vent condenser. The water to be deaerated, which is supplied through the vent condenser, recovers heat from the mixed steam vapor and air, whereby the steam with its contained air is condensed and the temperature of the water is raised before it enters the heating and deaerating chamber. These features are all present in the Gamble patent, and such variation as is made in the vent condenser in the construction of defendant's open reboiler type is shown in the prior art in the Webster patent No. 390,927. If the defendant's open reboiler type reads on the Elliott claims, those claims show a mere aggregation of the prior art as shown in Gamble, Webster and Cochrane.

Defendant's tray type of deaeration heater differs from the prior art construction of open water heaters merely in the form and arrangement of the trays above the water storage space in the heating and deaerating chambers and the addition of an external vent condenser. The trays in this construction are so arranged that the steam, coming up from the lower chamber and coming into contact with the water passing through the heating chamber, passes first through the deaerating trays and then in its upward passage through the heating trays. The trays are ingeniously arranged, so that the steam thoroughly permeates all of the space through which the water in spray form is passing down from the heating chamber to the deaerating chamber. Naturally, in order to direct the upward movement of the steam and compel it to flow in a horizontal direction from one side to the other in the defendant's apparatus, it has constructed baffles at the sides of the tray stacks.

The plaintiff claims that this tray type of deaerating heater infringes its patent, because the lower bank of trays in which the deaerating function is performed constitutes a thoroughfare heater, and the passage formed by the upward bank an induction heater. I think it is conclusively shown, however, that the thoroughfare induction heater combination is the equivalent of the arrangement found in the Gamble patent, 1,050,209, and is represented in the prior art by the earlier Cochrane patents and the Webster patent, 390,927; also British patent to Muchka, 29,-098 of 1909. As to the arrangement of induction heater and thoroughfare heater, they also appear in the prior art in defendant's Jones British patent, 5954 of 1911.

In the defendant's surface heater type of deaerating heater, there does not appear to be any essential difference from its tray type heater, except in the fact that the steam is not supplied to the deaerating chamber from an external source through a steam supply pipe, but is generated within the heating and deaerating chamber by evaporation of a portion of the water treated, in that the boiling of the water is caused by means of steam filled pipes located within the heating and deaerating chamber, and steam is supplied by the evaporation of the treated water after the latter has passed below the trays; the evaporation being caused by the dropping of the water upon the superheated pipes containing steam. Otherwise, there is no essential difference between the surface heater type and the tray type. If the tray type does not infringe, the same conclusion follows as to the surface heater type for there is no suggestion in the plaintiff's patent 1,457,153 of evaporation caused by the contact of the water with steam-filled tubes within the deaerating chamber.

[6] The general deduction from the evidence is that the defendant, in the development of its apparatus alleged to infringe, was aiming at the same results in deaeration as those produced by the plaintiff in the construction of its apparatus; that the open reboiler type and the tray type of heater in deaeration had been in use by the defendant under patents which it owned prior to any alleged invention by the plaintiff; and that in its adaptation of those apparatus, as well as in its surface heater type, it followed the natural development of prior art heaters, and obtained deaeration results better than those formerly obtained, which difference in results, however, represents only the natural development of its constructions of the prior art, and which do not constitute infringement of the plaintiff's patent, No. 1,457,153.

A decree may be presented, in accordance with this opinion, dismissing the bill, with costs to be taxed by the clerk.